```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF OHIO
                     EASTERN DIVISION


Kenneth L. Oyer,                    :

          Plaintiff,                :

     v.                             :    Case No. 2:13-cv-704

                                    :    JUDGE MICHAEL H. WATSON
Commissioner of Social Security,         Magistrate Judge Kemp
                                    :
          Defendant.
```

                    REPORT AND RECOMMENDATION

                     I.   Introduction

     Plaintiff, Kenneth L. Oyer, filed this action seeking review
of a decision of the Commissioner of Social Security denying his
applications for disability insurance benefits and supplemental
security income.  Those applications were filed on September 24,
2010, and alleged that Plaintiff became disabled on April 1,
2007.

     After initial administrative denials of his applications,
Plaintiff was given a hearing before an Administrative Law Judge
on December 20, 2011.  In a decision dated May 14, 2012, the ALJ
denied benefits.  That became the Commissioner's final decision
on June 21, 2013, when the Appeals Council denied review.

     After Plaintiff filed this case, the Commissioner filed the
administrative record on September 23, 2013.  Plaintiff filed
his statement of specific errors on November 4, 2013.  The
Commissioner filed a response on January 7, 2014.  No reply brief
has been filed, and the case is now ready to decide.

     II.  Plaintiff's Testimony at the Administrative Hearing

     Plaintiff, who was 27 years old at the time of the
administrative hearing and had graduated from high school (but in
special education courses), testified as follows.  His testimony

appears at pages 32-52 of the administrative record.

Plaintiff testified that he was in special education classes during the entire time he was in high school, and that he cannot read very well.  He also said that he picked the onset date of April 1, 2007, because that was when his anger and depression worsened.  He had worked, accompanied by a job coach, for some time in 2008 and 2009, and did some other seasonal work.  He had earlier worked as a stock person for Sam's Club but quit when he moved back to Ohio.  He had attempted to become a volunteer firefighter but did not pass the test to do that.

On a typical day, Plaintiff watched television and went for walks.  He did a few household chores such as putting dishes away.  He enjoyed hunting and riding four-wheelers.  He had some physical problems including pain in his back and ankles. Additionally, he had started to suffer from blackouts or fainting spells which happened four or five times per month, with no advance warning.  He had been hospitalized overnight for suicidal thoughts, and had sought emergency room treatment for anxiety. Plaintiff said he had panic attacks once or twice a week, caused by being around people or being anxious about getting something done on time.

Plaintiff had a driver's license and was able to drive.  He visited with relatives occasionally.  He had been able to work both at Sam's Club and, more recently, at Kmart by having someone read product labels to him and tell him where to put things.

III.  <u>The School and Medical Records</u>

The medical records in this case are found beginning on page 275 of the administrative record.  The pertinent records - those relating to Plaintiff's psychological condition, since that is the only issue raised in his Statement of Errors - can be summarized as follows.

A record from the Huntington Schools shows that Plaintiff

-2-

was referred for evaluation to an intervention specialist in 1999. He had been receiving special education since 1992. Testing indicated that he was in the bottom 4% in math reasoning, and below the first percentile on other skills tested (reading, writing, and math calculation). His full scale IQ had been measured as 76 in 1992 and 79 in 1995. These scores were "consistent over time and considered accurate." His communication skills were rated as significantly below average, as were his adaptive behavior skills, which were "lower than expected based on his ability level." He showed "deficits in all areas of adaptive behavior (self-care, communication, social, academic, and occupational) ...." Later records showed that his goals included obtaining entry-level employment and becoming able to live independently. (Tr. 220-37).

Plaintiff was evaluated by Dr. Tanley, a psychologist, on July 27, 2007. He reported being in good health but having trouble reading and spelling. He said he slept well and did not demonstrate or report any abnormal behaviors. His cognitive efforts ranged from low average to borderline. On testing, he scored in the Mild range of Mental Retardation with a full scale IQ of 66. Dr. Tanley though the test scores were valid; he did not have school records and could not verify the onset of any condition before age 18. Plaintiff did not score above the third grade level on any achievement test. Dr. Tanley rated Plaintiff's GAF at 85 but said that "[i]f it is later determined that the diagnosis of Mild Mental Retardation is appropriate in this case, then his GAF would be no higher than 60." Dr. Tanley found Plaintiff to be mildly impaired in his ability to relate to others and to maintain attention for simple, repetitive tasks, moderately impaired in his ability to understand and follow simple instructions, and not impaired in his ability to withstand work stress. (Tr. 275-78).

-3-

Over three years later, Plaintiff underwent another
consultative psychological examination, this one done by Dr.
Peterson.  She noted his prior treatment for a suicide attempt
and also his statement that he had never been fired from a job,
but always quit.  He had problems getting along with coworkers
and supervisors.  He also had difficulty doing repetitive tasks
correctly and reported getting angry and frustrated.  He appeared
anxious and said that being stressed out emotionally was typical
for him.  He was depressed on most days and described feeling
worthless and helpless.  His immediate memory was well below
average as were his word knowledge and understanding of verbal
concepts.  His concentration and persistence were poor.  Dr.
Peterson diagnosed an adjustment disorder with mixed anxiety and
depressive features and rated his GAF at 60/55.  She also had no
school records to assist her in making an Axis II diagnosis.  She
thought plaintiff had mild difficulties in the area of getting
along with others, moderate impairments in maintaining
concentration, persistence, and pace and in withstanding work
stress, and a marked impairment in his ability to understand,
remember, and follow instructions.  (Tr. 332-35).

The remainder of the records show treatment for a variety of
ailments, including an overnight psychiatric hospitalization on
November 2, 2011, for suicidal plans, and occasional reports of
depression or anxiety.  Plaintiff had also been treated for chest
pains and blackout spells.

IV.  The Vocational Testimony

A vocational expert, Dr. Olsheski, also testified at the
administrative hearing.  His  testimony begins at page 53 of the
record.

Dr. Olsheski identified Plaintiff's past work as a stock
clerk, which is listed as a heavy, semi-skilled job in the
Dictionary of Occupational Titles, but which Plaintiff performed

-4-

at the light exertional level.  He was asked some questions about
a hypothetical person who could work at any exertional level, but
who could perform only unskilled simple, repetitive tasks which
were not fast-paced, who needed to be in a static, predictable
environment with minimal change in routine, and who would need
oral instructions and would not have to read or write in
connection with his work.  According to Dr. Olsheski, someone
with those restrictions could not perform Plaintiff's past
relevant work but could perform unskilled jobs like cleaner or
hand packer, both medium or light jobs.  Those jobs could be done
by someone who was off task once or twice per week for 20 to 45
minutes, but if that happened every day, it might affect his
employability.  The need to have another employee assist in tasks
like reading labels or telling someone where to put items was, in
Dr. Olsheski's view, not usually consistent with employment
unless it had been pre-arranged with the employer.

     V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 10-
20 of the administrative record.  The important findings in that
decision are as follows.

The Administrative Law Judge found, first, that Plaintiff
met the insured requirements for disability benefits through
December 31, 2011.  Next, Plaintiff had not engaged in
substantial gainful activity from April 1, 2007 forward.  As far
as Plaintiff's impairments are concerned, the ALJ found that
Plaintiff had severe impairments including borderline
intellectual functioning, anxiety, and depression.  The ALJ also
found that these impairments did not, at any time, meet or equal
the requirements of any section of the Listing of Impairments (20
C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation
process, the ALJ found that Plaintiff had the residual functional

capacity to perform work at all exertional levels with these restrictions: he could perform simple, repetitive tasks, had to work in a setting that did not require fast-paced or strict time-limited tasks, and could work only in a predictable, static environment with minimal changes in routine.  The ALJ found that, with these restrictions, Plaintiff could not perform his past relevant work, but he could perform the jobs identified by Dr. Olsheski and that such jobs existed in significant numbers in the regional and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

    VI.  Plaintiff's Statement of Specific Errors

    In his statement of specific errors, Plaintiff raises a single issue.  He contends that the Commissioner erred in finding that Plaintiff suffered from borderline intellectual functioning rather than mental retardation, and that the Commissioner should have found Plaintiff disabled under Section 12.05(C) of the Listing of Impairments.  The Court analyzes this claim under the following standard.

    Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is

supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Section 12.05(C) of the Listing of Impairments provides that a claimant is presumptively disabled if (1) the claimant scores between 60 and 70 on a valid IQ test, (2) has another significantly limiting impairment, and (3) meets certain diagnostic criteria for mental retardation, particularly the manifestation of deficits in adaptive functioning prior to age 22. Plaintiff claims that he met all three of these requirements. He notes that he scored between 60 and 70 on the IQ test administered by Dr. Tanley; that the ALJ found that he had other severe impairments including anxiety and depression; and that his school records, portions of which are quoted above in Section III, show significant deficits in his adaptive functioning while he was still in high school. Plaintiff argues that the ALJ improperly viewed his IQ scores from 1992 and 1995, which were not in the required range, as evidence that his condition did not manifest itself prior to age 22, thus finding that the requirements of Section 12.05(C) had not been satisfied.

The ALJ devoted a section of his decision to the question of whether Plaintiff's impairments met or equaled any condition described in the Listing. Most of that section is devoted to a discussion of sections other than Section 12.05(C), however. What the ALJ said about that latter section is this:

-7-

> Finally, the paragraph "C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function. **Prior to age 22, the claimant's IQ scores were 76 verbal, 86 performance, and a full scale IQ of 79.**

(Tr. 16)(emphasis supplied). Although brief, the ALJ's reasoning is clear. He concluded that anyone who, prior to age 22, achieves a valid IQ score above the range found in Section 12.05(C), cannot satisfy that Listing, even if the claimant (like Plaintiff here) achieves a later valid IQ score within that range and also suffered from deficits in adaptive functioning prior to age 22. The question is whether that is legal error.

In defending the ALJ's decision, the Commissioner focuses on a different portion of that decision where the ALJ assesses Plaintiff's residual functional capacity. There (Tr. 17), the ALJ makes this comment: "the claimant does not have the requisite deficits in adaptive functioning as explained throughout this decision." That comment is immediately followed by a discussion of the GAF score of 85 assigned by Dr. Tanley and what that score typically means ("absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, and no more than everyday problems or concerns"). Id. The Commissioner dismisses the evidence that Plaintiff had severe deficits in adaptive functioning during his youth by arguing that "his IQ scores were higher than would be expected for someone with allegedly disabling cognitive problem." Commissioner's memorandum, Doc. 18, at 8.

There is no record support for that last statement. The ALJ made no such finding, and there is also a difference between "cognitive problems" and deficits in adaptive functioning. The

-8-

Court is therefore left with the question of whether, even assuming that the ALJ's discussion of deficits in adaptive functioning in the portion of the administrative decision devoted to residual functional capacity - which is not a relevant issue when deciding if a Listing has been met - can be imported into the ALJ's analysis of Listing 12.05(C), the ALJ properly interpreted either the law or the evidence about whether Plaintiff's condition met that Listing.

For a number of reasons, the Court finds the ALJ's decision seriously deficient. Taking the various rationales in reverse order, the ALJ's reliance of Dr. Tanley's GAF score of 85 is totally misplaced. Dr. Tanley explicitly declined to make any diagnosis on Axis II (which includes developmental disorders like mental retardation) because he had no school records to review. He noted that the IQ scores obtained during his interview were consistent with mild mental retardation and were valid. Consequently, if Plaintiff had mild mental retardation, his GAF would be no higher than 60. It was simply improper to construe his opinion about the effects of conditions other than mental retardation as evidence about the effect of that condition, but that is what the ALJ appears to have done.

Second, the ALJ's discussion of deficits in adaptive functioning, to the extent that it encompassed Dr. Tanley's opinion or other unspecified portions of the record, focused not on whether Plaintiff had such deficits prior to age 22, but whether he had them at the time of his application or the time of the hearing. The Court finds no reference to the school records dealing with that issue apart from the brief mention, in the ALJ's analysis of Listing 12.05(C), of one of the two IQ test scores shown in those records. It is not apparent that the ALJ ever appreciated the fact that there was evidence in the record about deficits in adaptive functioning during the developmental years - he certainly did not mention or discuss it - and,

-9-

consequently, there was no meaningful analysis of that criterion.

Lastly, the Commissioner does not appear to be defending the ALJ's actual reasoning process when dealing with Listing 12.05(C). The ALJ's statement (Tr. 16) that "the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70" is factually incorrect. He did have such scores, as the ALJ himself noted on the following page of his decision. The ALJ did not discuss deficits in adaptive functioning prior to age 22 at all in that portion of his decision. He seemed to believe that these were irrelevant so long as the claimant's qualifying IQ score occurred after the claimant turned 22. That is simply an erroneous interpretation of the Listing.

Generally speaking, "where multiple or conflicting IQ scores are available, the operative score for purposes of determining whether a claimant's impairments meet or equal the 12.05 listing is the lowest 'valid verbal, performance, or full scale IQ' score the claimant has received." Cauffman v. Astrue, 2010 WL 5464815, *6 (W.D. Wash. Nov. 12, 2010), adopted and affirmed 2010 WL 5464800 (W.D. Wash. Dec. 30, 2010). Courts have specifically rejected the notion that earlier, higher IQ scores invalidate later scores which satisfy the Listing. See Lewis v. Astrue, 2008 WL 191415 (N.D. Cal. Jan. 22, 2008). They have also held that the absence of IQ scores prior to age 22 is not fatal to a claim under Section 12.05(C); "[t]he Rules and Regulations clearly indicate that it was never intended for §12.05 to require intelligence testing prior to the end of the developmental period...." Tingler v. Astrue, 2008 WL 4238950, *20 (N.D. W.Va. Sept. 11, 2008).

This does not mean, of course, that an ALJ must completely disregard earlier (or later) IQ tests when analyzing an issue under Section 12.05(C). The ALJ, as a factfinder, may use all of the evidence of record to determine whether an otherwise qualifying IQ score is valid. See Hancock v. Astrue, 667 F.3d

-10-

470, 474 (9th Cir. 2012).  But the ALJ here made no finding as to whether the IQ test result obtained by Dr. Tanley was valid; it was not even mentioned in the ALJ's discussion of the Listing. Further, the ALJ appeared to assume that a claimant cannot show that his or her impairment is the equivalent of the one described in Section 12.05(C) if the record contains IQ scores which are all above 70.  That is not correct either.  As the court noted in Cadzow v. Colvin, 2013 WL 5585936, *2 (N.D. Tex. Oct. 10, 2013), "[a]ccording to POMS DI 24515.056(D)(c), slightly higher IQs (e.g., 70–75), coupled with other physical or mental disorders that impose additional and significant work-related limitation of function, which is the second criteria of listing 12.05(C), may support an equivalence determination."  Plaintiff achieved a verbal IQ score of 75 in 1992, which is within that five-point range, and his full scale IQ score of 76 that same year, and a 76 verbal IQ in 1995, are just one point higher.  The ALJ did not, however, appear to appreciate his ability to make a finding of equivalence based on these scores, something that should have been done even if the later qualifying scores were totally irrelevant - which, of course, they are not.

Lastly, it should have been a red flag to the ALJ that both Dr. Tanley and Dr. Peterson felt unable to make an Axis II diagnosis without the benefit of school records.  The ALJ made such a diagnosis - borderline intellectual functioning - but it is not apparent what that conclusion was based on.  As one with a duty to develop the record fully and fairly, the ALJ should have taken additional steps to obtain an evaluation of Plaintiff's mental retardation - obviously a key issue in this case - instead of coming to his own conclusions on that question.  A remand will allow the ALJ to address all of these points: to take the later IQ testing into account, to examine the question of whether there is credible evidence of deficits in adaptive functioning prior to age 22, to get medical opinions on the issue of mental

-11-

retardation, and to consider if Plaintiff has shown an impairment
equal to the one described in Listing 12.05(C).  That is what the
Court recommends.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the
plaintiff's statement of errors be sustained to the extent that
this case be remanded to the Commissioner pursuant to 42 U.S.C.
§405(g), sentence four.

### VIII.  Procedure on Objections

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a de novo determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation de novo, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  See Thomas v.
Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d
947 (6th Cir. 1981).


/s/ Terence P. Kemp

-12-

United States Magistrate Judge